IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER EUGENE WILSON, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:15cv00175 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| GERALD MCPEAK, *et al.*, | ) | United States District Judge |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

Christopher Eugene Wilson, a Virginia inmate proceeding *pro se*, filed this action in April 2015 under the Civil Rights Act, 42 U.S.C. § 1983. Liberally interpreting the complaint, the court construes it also to allege claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq*. Wilson asserts that the defendants violated his religious and equal protection rights by disallowing group religious study led by Jehovah's Witnesses ministers. Defendants filed a motion for summary judgment, and Wilson responded thereto, making this matter ripe for disposition. Having reviewed the record, the court concludes that the defendants are entitled to summary judgment.

I.

Wilson alleges that while he was housed at the New River Valley Regional Jail ("NRVRJ"), defendants Superintendent Gerald McPeak and Major Marty Stallard did not allow Jehovah's Witnesses ministers to "come in and study with [the inmates] as a group," like they allow ministers of other religious groups to do. As relief, Wilson seeks damages and injunctive relief to allow a Jehovah's Witnesses minister to lead a group service at the NRVRJ.[1]

---

[1] Since filing this action, Wilson was transferred to Pocahontas Correctional Center. The court notes that inasmuch as Wilson has been transferred to a new facility, his claim for injunctive relief against the named defendants is now moot. *See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (prisoner's transfer rendered moot his claims for injunctive and declaratory relief).

In their motion for summary judgment, defendants assert that Wilson's complaint is based on a "mistaken belief that members of his congregation were denied a request that they be permitted to provide group services to inmates." Defendants state that Wilson's church leaders have made no such request. They also state that Wilson was permitted to meet with a pastor from his church every week, even while he was housed in segregation. Wilson does not contest that he was allowed to meet on an individual basis with his ministers. He limits his complaint to the lack of group religious study.

McPeak avers that the NRVRJ has a policy that permits and encourages volunteers from the community to come into the jail to provide a variety of services, including religious services.[2] McPeak explains that there is a specific procedure in place for the approval, training, and orientation of community volunteers and that the procedures are in place to protect the security of the jail and ensure the usefulness and effectiveness of the volunteers. "Prospective volunteers shall complete an application for volunteer service. The application will be reviewed by the Programs Officer, who shall interview the applicant to determine whether he/she will meet the needs of the facility and where the applicant[']s talents can best be utilized." NRVRJ SOP No. 270, Procedures, C.

It appears defendants contributed to Wilson's confusion by failing to mention this policy to him. Wilson filed a request for services in January 2015 asking for group study with his ministers like other religions. He was told, "We do not allow Jehovah's Witnesses inside the secure part of the jail. The men that come in are Gideons and they are nondenominational." He

---

[2] Pursuant to NRVRJ Standard Operating Procedures ("SOP") Number 270, "[i]t is the policy of NRVRJ to use citizens volunteers, where feasible, to enhance and expand the services and programs offered to the inmates." NRVRJ SOP No. 270. "A maximum of 24 inmates are permitted to attend any general program or service depending on the location. The maximum number of inmates attending special events is limited to 40 unless approval for a larger group is granted by the Director of Security." *Id.* at Procedures, K.

then filed grievances regarding the same and received similar responses. There is no indication that Wilson was advised of the need for a request from his ministers or about any application process.

Nonetheless, on March 10, 2015, the Programs Director at NRVRJ received an email from James Buckwalter, who wrote on behalf of the local congregation of Jehovah's Witnesses. The email stated, in pertinent part:

> As you know, the local congregation of Jehovah's Witnesses has been faithfully visiting inmates at your facility for a number of years. Thus far, we have not had the same personal pastoral visitation access as other religious groups have been granted. This may be due in part to a failure on our part to inquire about the policies and procedures we would need to follow in order to receive that privilege. I am writing to request a brief meeting between you and two of our ministers . . . who are active in visiting some of your inmates.

The Programs Director replied to Buckwalter's email the same day, and according to McPeak, Buckwalter never responded. Leaders from the Jehovah's Witnesses church contacted jail officials again, and a meeting was held on May 28, 2015, to address both their request for increased access and Wilson's claim that the leaders were denied the ability to conduct group religious services. McPeak avers that, during the meeting, it was confirmed that the Jehovah's Witnesses leaders "simply wanted approval for additional volunteers from their church to be utilized when their regular volunteers could not visit due to illness, prior commitments, etc." McPeak further avers that the Jehovah's Witnesses leaders also "confirmed that they had no intention of conducting religious services to a group at the jail." There is no mention of whether the Jehovah's Witnesses ministers sought access to the secure part of the jail for purposes other than group religious study, but Wilson only complains of lack of group religious study.

McPeak declares that: 1) leaders from the Jehovah's Witnesses church have not asked to conduct group religious services; 2) neither he nor anyone else at the jail has denied the leaders a

request to conduct group religious services at the jail; 3) he has not prevented the church volunteers from going into the jail; and 4) he has not denied Wilson access to the church volunteers. McPeak states that he "cannot force [the Jehovah's Witnesses] church to provide services that they are unable or unwilling to provide."

Stallard declares that he did not deny the Jehovah's Witnesses church leaders any request to provide different or more services, he did not deny Wilson access to the religious services and programs provided by Jehovah's Witnesses volunteers, and he "does not have authority to force the leaders [of the church] to provide different or more services than there were able or willing to provide."[3]

In response to the motion for summary judgment, Wilson argues that Buckwater's email proves that the Jehovah's Witnesses church leaders want to provide group services at the jail, but the email itself does not state that. Wilson also states that the church leaders told him about the May 28, 2015 meeting and said that they requested permission to provide group religious services and their request was denied. Wilson, however, does not provide any affidavits from anyone who was at the meeting.

Defendants replied to Wilson's response largely reiterating arguments and statements made in the motion for summary judgment.[4] In his supplemental affidavit, McPeak again avers that he has not received a request to allow members of the Jehovah's Witnesses church to conduct group religious services at the jail and that when he met with them on May 28, 2015,

---

[3] Stallard's only involvement in Wilson's claims is that Stallard responded to a grievance appeal concerning group services. Merely responding to an inmate's administrative remedies does not implicate any constitutionally protected right. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (holding that prisoners do not have a constitutional right to participate in grievance procedures); *Brown v. Va. Dep't Corr.*, No. 6:07cv00033, 2009 U.S. Dist. LEXIS 3022, at *48, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009) ("[r]uling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation"). Accordingly, Wilson fails to state a claim against Stallard.

[4] Defendants also object to Wilson's assertions about the May 28, 2015 meeting as inadmissible hearsay.

they made no such request.  McPeak further avers that if he does receive such a request, he will permit the Jehovah's Witnesses to go through the same process applied to all other religious groups.[5]

II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 250.  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus

---

[5] Wilson responded to defendants' reply; however, pursuant to the Local Rules of this court, second responses by nonmovants are not permitted without leave of court. W.D. Va. Civ. R. 11(c) (After the movant's reply brief, "[n]o further briefs (including letter briefs) are to be submitted without first obtaining leave of court.") On February 11, 2016, Wilson also filed a letter purporting to be from Chris Foggy, a Jehovah's Witnesses minister who attended the meeting.  Consideration of Wilson's second response and the Foggy letter would not change the outcome because Wilson's response largely reiterated assertions previously made in his pleadings and the letter does not mention group study or services; instead, it references an interest in "coming inside the jail" and states that they need to submit applications and wait for their approval.

scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

RLUIPA and the First Amendment prohibit the government from imposing "a substantial burden" on an inmate's ability to exercise his religion unless the government can demonstrate an appropriate reason for the burden. *Lovelace v. Lee*, 472 F.3d 174, 199, n.8 (4th Cir. 2006). The primary difference between RLUIPA and the First Amendment, in this context, is that RLUIPA adopts a strict scrutiny standard of review, instead of the reasonableness standard under the First Amendment. *Id.*

The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. *Krieger v. Brown*, 496 F. App'x. 322, 324 (4th Cir. 2012); *Adkins v. Kaspar,* 393 F.3d 559, 567 n.32 (5th Cir. 2004); *Civil Liberties for Urban Believers v. Chicago,* 342 F.3d 752, 760 (7th Cir. 2003). A substantial burden on religious exercise occurs when a state or local government "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (*quoting Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 70, 718 (1981), and *Sherbert v. Verner*, 374 U.S. 398 (1963)). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger*, 496 F. App'x at 325 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a . . . plaintiff

demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Wilson has not demonstrated that the defendants have imposed a substantial burden on his ability to exercise his religion. Wilson does not challenge the NRVRJ's policies, which allow for both citizen volunteers and group services when certain procedures are followed. Instead, Wilson states that the defendants have not followed their own policy because they allegedly have denied the Jehovah's Witnesses leaders' request to provide group religious services in the jail.[6] In support of his assertion, Wilson points to an email sent by a member of the local Jehovah's Witnesses congregation. He also provides hearsay evidence about a May 28, 2015 meeting between Jehovah's Witnesses leaders, McPeak, and other jail officials. *See* Fed. R. Evid. 801, 802.

Defendants, on the other hand, assert that Jehovah's Witnesses leaders have not asked to provide group religious services at the jail and, thus, have not been denied the opportunity to do so. McPeak states that at the May 28, 2015 meeting, Jehovah's Witnesses leaders only requested that jail officials allow additional volunteers to meet individually with inmates. He also states that church leaders confirmed that they have no intention of conducting group religious services

---

[6] The court notes that "prison officials' failure to follow internal prison policies [is] not actionable under [section] 1983 unless the alleged breach of policy rises to the level of a constitutional violation." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013).

at the jail.  Finally, McPeak states that if he does receive a request from Jehovah's Witnesses leaders to conduct group religious services, he will permit them to go through the same process as other religious groups.  Until such a request is made, defendants point out that Wilson was able to visit with the clergy of his choice on a weekly basis while incarcerated at the NRVRJ.

The court notes that Wilson has not established that the Jehovah's Witnesses leaders have submitted an application or followed the procedures required in order to conduct group religious services.  In addition, the Buckwalter email that Wilson cites to makes no reference to conducting group religious services and does not prove that the church leaders had or intended to request permission to conduct group services.  Based on the record, the court finds that Wilson has not demonstrated that the defendants have "put[] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  Accordingly, the court will grant defendants' motion for summary judgment as to Wilson's First Amendment and RLUIPA claims.

IV.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To that end, the Equal Protection Clause affords that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1982).  To establish an equal protection violation, a plaintiff must first demonstrate that he has been "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination"; once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.  *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (requiring proof of racially discriminatory intent or purpose to show an equal protection

violation); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003). Mere conclusory allegations of discrimination are insufficient to state a claim. *Spaulding v. Dixon*, No. 90-7315, 1990 U.S. App. LEXIS 15560, at *2, 1990 WL 126136, at *1 (4th Cir. Sept. 4, 1990); *Chapman v. Reynolds*, 378 F. Supp. 1137, 1139 (W.D. Va. 1974).

Wilson asserts that Jehovah's Witnesses inmates are treated differently than inmates of other religions because inmates of other religions have group religious services led by a minister, while the Jehovah's Witnesses inmates do not. However, Wilson has not demonstrated that he is similarly situated to followers of those religions or that the alleged unequal treatment is the result of intentional or purposeful discrimination. As stated previously, there is no evidence that the Jehovah's Witnesses religious leaders asked for permission to conduct group services or complied with the procedures to do so. Wilson has not presented any evidence to show that other religious leaders were allowed to conduct group services without making a request and complying with the procedures. Accordingly, the court concludes that Wilson's equal protection claim fails and will grant defendants' motion for summary judgment as to this claim.

V.

For the reasons stated herein, the court will grant defendants' motion for summary judgment and enter judgment in defendants' favor.

An appropriate order will be entered.

Entered: February 18, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge